UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                   **REPORT AND**
                                                                   **RECOMMENDATION**

      - against -

                                                                   18 CR 96 (BMC)

JAMAL ROBERTS,

                              Defendant.
----------------------------------------------------X

**POLLAK**, United States Magistrate Judge:

       On December 9, 2017, defendant Jamal Roberts was arrested by the New York City Police Department (the "NYPD") and subsequently indicted on the charge of possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). On May 2, 2018, the defendant filed a motion to suppress certain physical evidence seized during the search of the vehicle he was driving on December 9, 2017, along with various statements allegedly made by the defendant following the stop.

       On February 23, 2018, the defendant's motion was referred to the undersigned by the Honorable Brian M. Cogan to conduct a suppression hearing and issue a report and recommendation. A hearing was held before this Court on June 13, 2018, at which time the government presented the testimony of Officer Job Bellevue and Officer Soney Varghese. Thereafter, the parties requested an opportunity to supplement their briefing. After the parties submitted their briefing, oral argument was held on July 26, 2018.

Based on the testimony of the two officers, which this Court credits in its entirety, and the exhibits presented by the government and the defendant, this Court respectfully recommends that the defendant's motion to suppress be denied.

## FACTUAL BACKGROUND

According to the government, defendant Jamal Roberts is prohibited from possessing a firearm based on his prior felony convictions, including a December 10, 2003 conviction on a charge of attempted criminal possession of a controlled substance in the third degree,[1] in Kings County Supreme Court, and a May 5, 2010 conviction in the Court of Common Pleas of Luzerne County, Pennsylvania, on a charge of possession with intent to deliver a controlled substance[2] and related charges.[3] (Govt. Mem.[4] at 2).

During the suppression hearing, the government's witnesses testified that on December 9, 2017, NYPD officers Job Bellevue and Soney Varghese of the 81st Precinct and members of the anti-crime unit were on patrol in plain clothes and an unmarked car near the intersection of Fulton Street and Howard Avenue in Brooklyn, New York. (June 13, 2018 Tr.[5] at 4, 42-43, Govt Ex. 1). Around 2:50 p.m. in the afternoon, the officers observed a bronze Pontiac sedan traveling westbound on Fulton Street and making a turn onto Howard Avenue. (Id. at 4-5, 43-44). After making the turn, the officers observed the Pontiac traveling southbound against traffic on Howard Avenue, which is a one-way street going northbound. (Id. at 6, 44, Govt. Ex.

---

[1] See N.Y. Penal L. 220.39 (a Class C felony).
[2] See 35 P.S. 780-113(a)(30).
[3] He was also charged in Pennsylvania with possession of a controlled substance in violation of 35 P.S. § 780-113(a)(16); and a state misdemeanor.
[4] Citations to "Govt. Mem." refer to the Government's Memorandum of Law in Opposition to the Defendant's Motion to Suppress, dated May 29, 2018.
[55] Citations to "June 13, 2018 Tr." refer to the Transcript of the Suppression Hearing held before this Court on June 13, 2018.

2). Both officers testified that traveling the wrong direction on a one-way street is a violation of New York State Vehicle and Traffic Law, but that normally it results in the issuance of a summons; it is not an offense for which an arrest is generally authorized. (Id. at 40-41, 44).

On cross-examination, the defendant's counsel questioned Officer Bellevue as to how many car lengths down the block the defendant traveled before he came to a stop, and while the officer testified it was approximately three car lengths, the officer made it very clear that the defendant had made an illegal left turn "against traffic." (Id. at 26). Officer Bellevue also testified on cross-examination that there was "a significant amount of snow," and identified Defendant's Exhibits C and D, which were video clips of the scene and the weather conditions on that day. (Id. at 29-30). The officer conceded that the conditions "were wet that day and snowing," and that could lead to reduced visibility. (Id. at 31).

The officers stopped and approached the vehicle on Howard Avenue. (Id. at 6-7, 44). Officer Bellevue approached the driver's door and Officer Varghese approached the passenger's door. (Id. at 44). Officer Bellevue testified that as he approached the driver's side of the car, he saw movement in the car. (Id. at 8-9). He testified that although the windows of the vehicle were "all fogged up," he could see the silhouettes of the people in the vehicle and he observed one of the individuals "dipping" his torso inside the vehicle. (Id.). Based on his experience as a police officer, including "[n]umerous" car stops during his career, Officer Bellevue believed that this motion indicated that the individual was "attempting to conceal contraband," id. at 9, or that the individual was intoxicated. (Id. at 15). According to the officer, typically someone who had been pulled over and stopped would just turn around or pivot their torso or their head. (Id. at 9). Officer Bellevue testified that the "dipping" motion was "atypical" and caused him to approach

3

the vehicle cautiously. (Id.) Officer Varghese testified that in his experience, someone dipping their body down during a car stop would be "trying to hide something." (Id. at 46).

Officer Bellevue further testified that by the time he reached the driver's side, the driver still had not rolled down his window, which in the officer's experience was also not typical. (Id. at 10). Indeed, Officer Varghese confirmed that, in his experience, "the first thing that the driver does is like roll the windows down." (Id. at 45). Officer Bellevue tapped on the driver's window, after which the driver, identified by the officer as defendant Roberts, lowered the window. (Id. at 9-10). When the officer asked the defendant for his driver's license, registration, and insurance, the defendant provided only a Pennsylvania State identification card. (Id. at 11, Govt Ex. 7). On cross-examination, the officer stated that at the time he was given the identification card, the defendant told him that the date of birth and name on the identification card would match his license. (Id. at 31). However, given that the photograph on the identification card was not clear, Officer Bellevue was unable to confirm that the defendant was the person in the photograph. (Id. at 13). He also testified that he could not confirm that the identification card was authentic: "[u]sually when you present an identification card or a driver's license, the picture is clear and has to be clear for identification." (Id. at 32). The officer testified that he could "barely see the face versus who I was looking at," and he "truthfully, . . . couldn't tell whether the card was authentic at that point because usually when someone gives you an identification card or a driver's license, the picture is clear." (Id. at 13, 32). Although a license check was later run and it was determined that Mr. Roberts had a valid license, that check did not occur until after Mr. Roberts was placed under arrest and taken to the precinct.

The officer testified that at the time of the initial stop, he had no way to run the identification on the scene. (Id. at 33).

Since the identification card was unclear, the officer asked the defendant to step out of the vehicle because he wanted to do a field sobriety check. (Id. at 13-14). The officer explained that there were several reasons that he asked the defendant to step out of the vehicle, including the fact that given the time of day and the weather, the defendant was driving against traffic on a one-way street, and engaged in the "dipping motion" which could have indicated he was either intoxicated or concealing contraband. (Id. at 15). On cross-examination, the officer further explained that because it was broad daylight, and the defendant was traveling against traffic, he was concerned that the driver was intoxicated, which is one factor that could have caused the driver to commit the traffic infraction. (Id. at 36). He further explained on cross-examination that he had been trained to recognize the signs of drunk driving. (Id.) Moreover, although he did not smell alcohol on the defendant's breath, the officer "still needed to determine his sobriety," explaining that he was "not going to stick [his] head into someone's vehicle." (Id. at 37). He also testified that after the arrest, the defendant was not charged with driving while intoxicated and in fact, no sobriety tests were performed at the precinct. (Id. at 38).

Officer Bellevue testified that he had to ask the defendant twice to get out of the vehicle before he actually complied. (Id. at 13). Before bringing the defendant to the rear of the vehicle, Officer Bellevue gave a thumbs-up to Officer Varghese, which is a code indicating that Officer Bellevue wanted the driver and passenger to exit the car because he believed that there was possible contraband or evidence of a crime in the car. (Id. at 47). Accordingly, Officer

Bellevue took the driver out of the car while Officer Varghese took out the passenger, and they proceeded to the rear of the vehicle. (Id. at 47-48).

As Officer Bellevue was having a conversation with the defendant at the rear of the vehicle, Officer Varghese went around the vehicle to do a check. (Id. at 15, 48). According to Officer Varghese, he searched the "grabbable area of the vehicle," meaning under the front driver's seat, under the passenger seat, the space between the center console and the driver's and passenger's seat. (Id. at 48). While he was searching the vehicle, Officer Varghese discovered a firearm under the front driver's seat, which he identified as having a "red design on the butt of the gun." (Id. at 49). He testified that he had "to peak [his] head in between the steering wheel and the floor" in order to see the gun." (Id. at 50). After he observed the firearm, Officer Varghese conveyed a code word, "Narnia," that indicated that there was firearm in the vehicle, and returned towards the rear of the vehicle whereby Officer Bellevue placed the defendant under arrest. (Id. at 16, 50).

As he was being placed in handcuffs, the defendant stated: "The hammer's[6] mine, the hammer's mine. You don't have to take him." (Id. at 16-17; see also 50). He made additional statements to the officer, including that he had just come from the funeral of a friend, who had been killed, and that he had borrowed the gun from a friend for protection. (Id. at 17).

After the defendant and passenger were both placed under arrest, the officers called for another vehicle to transport them to the command. (Id.) Officer Bellevue then drove the defendant's car back to the precinct, and the evidence collection team was notified. (Id. at 17-

---

[6] The officer explained that the term "hammer" is a slang word for firearm or gun. (Id. at 17).

18). The evidence collection team processed the vehicle and the contraband found in the vehicle, and prepared vouchers to inventory the contraband and property found in the vehicle for evidence and safekeeping. (Id. at 18). Officer Bellevue also explained that the NYPD has a system to voucher anything found in the car and that he followed those procedures in this case. (Id. at 20). He identified a photograph of the defendant's vehicle, along with a photograph of the driver's side front seat showing the location of the firearm observed by Officer Varghese. (Id. at 18-20, Govt. Exs. 4, 5). In identifying the photograph, the officer described where the firearm was underneath the seat: "you can see the handle and the – the handle of the firearm, which was the first thing you could see, and the top slide portion of the firearm." (Id. at 21). He also pointed out the distinct "red sights" of the gun. (Id. at 22). Officer Bellevue testified that the gun was loaded with ammunition in the chamber and the magazine. (Id.). He explained that the gun had remained in the vehicle and had not been moved by either him or his partner until he removed it after the car was taken to the precinct. (Id.)

According to Officer Bellevue, the defendant was interviewed in the station by an NYPD detective after being given his Miranda rights. (Id. at 23). The defendant waived his rights and agreed to speak to the officer. (Id.) According to Officer Bellevue, the defendant reiterated ownership of the firearm, that it was his for protection, that he had just come from the funeral of a murdered friend, and that he did not want the passenger to get into trouble because of the gun. (Id.)

## DISCUSSION

The defendant moves to suppress the firearm found by the police officers after they stopped and searched his car, arguing that the search did not comport with the Fourth Amendment. (Def.'s Decl.[7] ¶ 1). In his Declaration, the defendant asserts that he never consented to the search of his car, and he does not believe that the police had a warrant to search his car. (Id. ¶ 2). The defendant argues that there is a factual dispute regarding the officers' reasons for conducting the search of his vehicle. (Weil Decl.[8] ¶ 5). The defendant maintains that to the extent that the officers claimed to have seen a firearm in the car, he does not believe the firearm was visible from outside the car. (Id.) The defendant also argues that if the Court finds that the search was unlawful, not only should the firearm discovered during the search be suppressed, but the Court should also suppress the defendant's statements made both at the scene and at the precinct as well as the product of an unlawful search. (Id. ¶ 6).

A. Affidavit Requirement

In its Memorandum of Law dated May 29, 2018 and submitted in response to the defendant's initial set of motion papers, the government raises the argument that Roberts was not entitled to a hearing in the absence of an affidavit or other sworn statement in support of his motion that is based on personal knowledge. (Govt. Mem. at 7).

It is well-established law in this Circuit that where the defendant has failed to submit an affidavit based upon personal knowledge, there is no factual issue properly before the court and a

---

[7] Citations to "Def.'s Decl." refers to the Declaration of Jamal Roberts, dated April 6, 2018.
[8] Citations to "Weil Decl." refers to the Declaration of Michael D. Weil, Esq., counsel to the defendant, dated May 2, 2018.

motion to suppress evidence should be denied. See United States v. Ahmad, 992 F. Supp. 682, 685 (S.D.N.Y. 1998); see also United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967). Indeed, a "criminal defendant is not entitled to an evidentiary hearing on a motion to suppress evidence absent the submission of an affidavit based on personal knowledge setting forth facts necessary to make out a prima facie case that the evidence was obtained in violation of the defendant's rights." United States v. Defede, 7 F. Supp. 2d 390, 394 (S.D.N.Y. 1998).

Thus, under normal circumstances, the defendant's failure to submit an affidavit would result in an automatic denial of the motion to suppress. Here, however, defendant Roberts has provided the Court with a sworn Declaration in accordance with the law in this Circuit. The government's argument is that the Declaration is "conclusory" and fails to provide particular facts that warrant a hearing. However, the Court disagrees.

The alleged basis for the warrantless search of the defendant's vehicle is based on the officer's observation of the firearm in the car. The defendant's Declaration states that he does not believe the firearm could have been seen from outside the car. (Def.'s Decl. ¶ 4). This raises a factual dispute that warrants a hearing because whether the officer could see the gun determines not only whether the gun should be suppressed, but also whether the subsequent statements should be suppressed as fruits of an unlawful search.

B. Investigatory Stop

Turning to the initial stop and detention of the defendant's vehicle, it is clear that a police officer may stop a vehicle when he observes a traffic violation being committed. See Wren v. United States, 517 U.S. 806, 814 (1996). The standard for investigatory stops applied by the Second Circuit is the "authorization" test which looks to whether the "arresting officer had

probable cause to believe that a traffic violation occurred or was occurring in the officer's presence and was authorized by state or municipal law to effect a custodial arrest for the particular offense." See United States v. Scopo, 19 F.3d 777, 781 (2d Cir.), cert. denied, 513 U.S. 877 (1994). Indeed, even when the observed traffic violation is a minor one, the officers are within their authority to stop the driver for violating state law. See id. Moreover, the Second Circuit has held that the officers' subsequent failure to issue a ticket or citation for the traffic violation does not render the stop unconstitutional. See United States v. Dhinsa, 171 F.3d 721, 725-26 (2d Cir. 1999). Even if the stop is determined to be pretextual, the Second Circuit has noted that that question is irrelevant to determining the validity of the arrest; "[s]o long as the stop was lawful, the resulting arrest will not violate the Fourth Amendment." United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994).

In this case, there was reasonable suspicion to stop the defendant's vehicle, which was driving the wrong way down a one-way street against traffic in broad daylight. Defendant Roberts does not challenge the officers' observations as to the events leading to the stop, nor does he argue that they did not have probable cause for stopping the vehicle based on the clear traffic violation.

Indeed, these observations provided more than reasonable suspicion to justify stopping the defendant's car. See, e.g., United States v. Scopo, 19 F.3d at 782 (quoting United States v. Cummins, 920 F.2d 498, 500 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1992)). As the officers testified, they observed the defendant in the act of committing a traffic violation, providing probable cause to stop the defendant.

C. Vehicle Search

With respect to the search of the defendant's vehicle, the government notes that under the "automobile exception" to the Fourth Amendment, an officer may conduct a warrantless search of a motor vehicle if there is probable cause to believe that the vehicle contains evidence of a crime or contraband. (Govt. Mem. at 12 (citing United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004))); see also United States v. Wilson, 699 F.3d 235, 245 (2d Cir. 2012). Under Illinois v. Gates, probable cause to search arises when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. 213, 238 (1983). In making this probable cause analysis, courts are to consider the "totality of the circumstances," id. at 230-31, including the officer's prior experience. United States v. Pughe, 441 Fed. Appx. 776, 778 (2d Cir. 2011).

The defendant argues that probable cause did not exist in this case. The defendant contends that the testimony from the officer establishes only that he observed the defendant turn the wrong way down the street and that the defendant did not even travel the full way down the block before he pulled over, suggesting that the defendant realized he had committed the traffic infraction. (Id. at 4). Furthermore, the defendant points out that visibility that day was poor which might have caused the defendant to make the wrong turn, and argues that this is not a case where the "infraction itself was so extreme that it's somehow indicative of other criminal conduct." (Id. at 4-5).

As for Officer Bellevue's testimony that he saw "dipping motion," the defendant argues that it was not clear who the officer saw doing it and while such a motion could be consistent

11

with concealing contraband, it could equally be consistent with someone picking something up off the floor. (Id. at 5). As for Officer Bellevue's testimony that the defendant did not immediately open the window, the defendant argues that it was "a blizzarding day," and even though the officer stated that he wanted to conduct a sobriety test, there were no signs of intoxication present. (Id. at 5, 6). Even if the officer had some concerns, those concerns were dissipated after he spoke to the defendant behind the car. (Id. at 6). Counsel argues that there was nothing to suggest that there would be evidence of a crime or contraband in the vehicle; the officer merely had a hunch, but that is not enough. (Id. at 7).

In responding to the defendant's argument, the government contends that the totality of the circumstances provides the basis for the officer's belief that there was probable cause to conduct a search. (Id. at 10-11). The government relies on: 1) the officers' observation of the vehicle driving the wrong way down a one-way street; 2) the fact that even though it had been snowing earlier in the day, it was clear at the time of this incident and broad daylight; 3) the testimony of Officer Bellevue in observing the dipping motion; 4) the window was not down; 5) the fact that the officer is shown an identification card instead of a driver's license and the photo on the identification card is unclear; and 6) the defendant needs to be asked twice before he gets out of the car. (Id. at 11-12). The government argues that all of these factors together suggest to the officers that the individuals are not acting in a typical way and therefore may be hiding contraband. (Id. at 12).

The Court agrees with the government. Probable cause is a "flexible, all-things-considered approach," Florida v. Harris, 568 U.S. 237, 244 (2013), which requires that the

circumstances be considered in their totality, rather than in isolation. See e.g., United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) (noting that "[c]ourts do not isolate each factor of suspicion but instead look to the totality of the circumstances"). Having carefully considered the evidence presented at the hearing, the Court finds that the officers had probable cause to believe that the car contained evidence of a crime or contraband. As this Circuit found in United States v. Pughe, the "[e]xperience of the officer is a relevant factor in the probable cause inquiry." 441 F. App'x at 778. Based on Officer Bellevue's prior experience, which included "hundreds if not thousands of stops," he believed that the dipping motion and the defendant's failure to roll down his window when pulled over suggested that the defendant was attempting to hide contraband. (July 26, 2018 Tr. at 11). Although the defendant argued that the dipping motion could also be consistent with someone picking something up off of the floor, id. at 5, "[t]he fact that an innocent explanation may be consistent with the facts as alleged . . . does not negate probable cause." United States v. Gagnon, 373 F.3d at 236 (quoting United States v. Fama, 758 F.2d 834, 838 (2d Cir.1985)). In conjunction with the officers' observation of the defendant committing an obvious traffic violation—namely, driving the wrong way down a one-way street—and the defendant's production of an identification card rather than a driver's license, the totality of these circumstances gave the officers probable cause to search the vehicle.

Furthermore, the Court notes that this Circuit has found that a defendant's "furtive movement provide[s] a legal basis for the protective search." United States v. Paulino, 850 F.2d 93, 94, 98 (2d Cir. 1988), cert. denied, 490 U.S. 1052 (1989) (upholding protective search of a car based on the officers' observation of the defendant "in the back seat moving his torso and bending over as if placing an object on the floor"). Although neither officer explicitly testified

that he feared for his safety, Officer Varghese testified that he limited his search to the "grabbable area" of the vehicle, indicating that he did not conduct a comprehensive search of the vehicle. (See June 13, 2018 Tr. at 48). Given Officer Bellevue's observation that one of the individuals in the vehicle was "dipping" his torso as the officer approached the vehicle, (id. at 9), the officers had reasonable suspicion to conduct a protective sweep of the vehicle.[9]

In conclusion, the Court finds that the officers had probable cause to conduct a search of the vehicle and respectfully recommends that the defendant's motion to suppress the physical evidence be denied.

C. Inventory Search

The government argues in the alternative that the firearm would have been discovered as part of a lawful inventory search even if the search of the Pontiac was determined to be unlawful. (Govt. Mem. at 14 (citing United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006) (holding that "evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation"))). Given that the officers had probable cause to search the vehicle, it is not necessary for the Court to decide whether the evidence is admissible under the inevitable discovery doctrine. The Court notes, however, that the government did not meet its burden under United States v. Heath, which requires "a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred."

---

[9] Finally, the Court finds that the firearm was in plain view, pursuant to Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) and United States v. Delva, 858 F.3d 135, 149 (2d Cir. 2017), cert. denied, 138 S. Ct. 1309 (2018). Here, Officer Varghese testified that all that he did to observe the firearm was "peak [his] head in between the steering wheel and the floor"). (June 13, 2018 Tr. at 50).

455 F.3d at 55. Indeed, the government offered no evidence to suggest that the defendant would have been arrested had the firearm not been discovered. Rather, Officer Bellevue testified on cross-examination that traveling in the wrong direction is not generally an arrestable offense; rather, it is an offense for which a summons can be given. (June 13, 2018 Tr. at 40-41).[10] The fact that the defendant did not have a proper license also does not constitute the type of violation that would result in an arrest, particularly, whereas here, the defendant told the officers that the information on the Pennsylvania State identification card would match the information on his license, which it did. (Id. at 31-33).

In the absence of any evidence from the government that the defendant would have been arrested even if the officers had not discovered the firearm, the Court concludes that the government failed to meet its burden in showing that an inventory search would have been conducted and the firearm would have been discovered and admissible under the inevitable discovery doctrine.

D. Defendant's Post-Arrest Statements

The defendant moves to suppress the statements he made to the officers at the scene of the car stop and thereafter at the precinct as "fruit of the poisonous tree" of the unlawful stop and search.

Based on the evidence presented during the hearing, the Court finds that the statements made by the defendant made at the time of his arrest were spontaneous and not made in response

---

[10] Evidence offered by the defendant corroborates the officer's testimony that the offense for which the defendant was stopped—namely, driving the wrong direction on a one-way street—is an offense for which a summons is often given. (June 13, 2018 Tr. at 56; Def.'s Exs. D & E; see also June 13, 2018 Tr. at 56 ("unlicensed driving is [also] frequently a summonsable offense")).

15

to questioning or interrogation by the officers. When a statement is uttered spontaneously and not in response to interrogation, such statement is admissible. See, e.g., Miranda v. Arizona, 384 U.S. 436, 478 (1966) (holding that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."); Folkes v. Lee, No. 10 CIV. 5416 BMC, 2011 WL 2610496, at *4 (E.D.N.Y. June 30, 2011) (noting that "[t]he cases are uniform that the spontaneous declaration of a suspect in custody, made before the police have the opportunity to advise him of his Miranda rights, does not result in a Miranda violation.").

In this case, after Officer Varghese found the firearm in the vehicle, Officer Bellevue proceeded to arrest the defendant. As the defendant was being arrested, he stated, "The hammer's mine, the hammer's mine. You don't have to take him." (June 13, 2018 Tr. at 16). There was no evidence presented to suggest that these statements were made in response to a question posed by either officer, and the Court respectfully recommends that the motion to suppress be denied based on the spontaneity of these statements.

As for the statements made later at the precinct, the defendant not argue that he did not receive or understand his Miranda warnings. Instead, he simply relies on the argument that any statements made were the fruit of the poisonous tree and should be suppressed in light of the lack of probable cause to conduct the search.

The government argues that even if the search was found to be unlawful, under the attenuation doctrine, the defendant's statements should still be admitted because it argues that "his confession was an 'act of free will [sufficient] to purge the primary taint of the unlawful invasion.'" (Govt. Mem. at 17 (quoting Wong Sun v. United States, 371 U.S.471, 486 (1963))).

Given that there was probable cause to stop and arrest the defendant for a traffic violation and probable cause to search the vehicle, the Court need not reach the question of whether the attenuation doctrine applies.

Accordingly, the Court respectfully recommends that the defendant's motion to suppress his post-arrest statements, be denied, given the finding that the stop of the vehicle and subsequent search were constitutional.

## CONCLUSION

Accordingly, it is respectfully recommended that the defendant's motion to suppress the evidence seized and the statements made at the time of his arrest be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); FED. R. CRIM. P. 59(b)(2), 6(d), 72; Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
August 22, 2018

/s/ Cheryl L. Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York